**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert James ANDRINO, Defendant-Appellant.**

**Nos. 72–1890, 72–1891.**

United States Court of Appeals, Ninth Circuit.

July 10, 1974.

---

John J. Flynn (argued), of Flynn, Kimerer, Thinnes & Galbraith, Phoenix, Ariz., for defendant-appellant.

Robert M. Carney, Special Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

Before BARNES and HUFSTEDLER, Circuit Judges, and LUCAS,* District Judge.

LUCAS, District Judge:

These appeals are from Andrino's respective criminal convictions on three counts of violating the extortionate credit transactions statute, 18 U.S.C. § 891 et seq. (Title II of the Consumer Credit Protection Act, 82 Stat. 159.) Andrino was indicted twice, on two counts each, for violation of 18 U.S.C. § 894, collection of extensions of credit by extortionate means. The cases were consolidated for trial. The jury returned guilty verdicts as to both counts of the first indictment, and a guilty verdict as to the second count of the second indictment.

The cases concern three separate occasions involving Andrino and various persons.

### The "Sbrocca incident"

On October 18, 1969, Romano Sbrocca, proprietor of a dry cleaning business in Phoenix, visited Andrino's home in Paradise Valley, Arizona. The motive for the visit is unclear. Sbrocca apparently went by implied invitation from Andrino, one of his patrons. Sbrocca became involved in a gin rummy game with Andrino and his companion and lost $600.-00. Sbrocca did not sign an evidence of the debt, nor did Andrino request him to pay the debt. The following day Andrino appeared at Sbrocca's place of business and demanded payment. Sbrocca refused, and Andrino became angry and left. That evening, while driving his panel truck, Sbrocca was struck from behind by an automobile which unsuccessfully attempted to force him off the road. Sbrocca testified that the driver appeared to be Andrino, accompanied by another man. The incident was corroborated by a police officer who filled out a report at the scene. The next day, Andrino called Sbrocca on the phone, and, utilizing abusive language, once again demanded payment of the debt. When Sbrocca accused him of the side-swiping incident on the previous night, Andrino laughed and made no effort to deny his involvement. After this conversation, two very large men appeared at Sbrocca's establishment and demanded payment of the debt. Sbrocca refused their demands, and they left. He then received a second phone call from Andrino. After that call, the men reappeared and remained in Sbrocca's parking lot. Sbrocca became upset, wrote a check made out to Andrino, and delivered it to the two men. Sbrocca testified that the reason he made payment was because he felt "that $600.00 wasn't worth any fear at all or wasn't worth jeopardizing anything else."

### The "Bourassa incident"

In September 1970, Andrino, accompanied by Attila DeAgh, approached Richard Bourassa, a salesman in a Phoenix furniture store, with an inquiry as to the possibility of redecorating his home. On or about September 17, 1970, Bourassa visited Andrino's home for the purpose of an appraisal, and he was induced to play a game of "Filipino Rummy." Bourassa lost $1,189.00 to Andrino. He wrote an I.O.U. for that amount and left. The next day Andrino called Bourassa to tell him that he would visit him soon to collect the debt. Bourassa reported the incident to his manager and called the Phoenix police. He also made arrangements for temporary relocation of his family. Late that afternoon, Andrino arrived at the furniture store. Bourassa refused to pay the debt, claiming illegality, to which Andrino replied that he had ways of enforcing such obligations, suggesting that Bourassa knew well what he meant. Andrino then stated: "You do have a wife and children." Andrino also suggested that he would inform Bourassa's employer of the debt. Bourassa agreed to approach his employer with Andrino, but the latter refused. Andrino represented that he would settle

---

* The Honorable Malcolm M. Lucas, United States District Judge for the Central District of California, sitting by designation.

for $50.00. Bourassa then withdrew $50.00 from the cash register, and handed it to Andrino, who, with a sleight of hand, managed to retain the note while accepting the money. Andrino then demanded to know when the balance would be paid. This entire sequence of events was witnessed by Bourassa's manager, and by a plain-clothes man from the Phoenix police.

### The "Morrison incident"

In September 1970, Gerald Morrison, seeking to place a bet, was put into contact with a bookmaker named "Bobby" by George Giordano. ("Bobby" was subsequently identified as Andrino.) Morrison lost $1,100.00 on the bet. Giordano contacted Morrison for collection of the debt, but Morrison refused to pay it. Andrino called Morrison twice, the first time threatening him that if he did not pay "he would tear [his] head off." Subsequently, Morrison called Andrino to arrange for a meeting place in order to pay $500.00 of the debt. Morrison was met by Giordano at the rendezvous, a local cocktail lounge. Giordano introduced him to Walter Baronick (who was indicted along with Andrino, but was given immunity to testify at the trial). The debt was discussed among the three, in the course of which discussion Baronick struck Morrison several times in the face. (Baronick later testified that he was to be paid "two and a half and I only got a hundred.") Morrison then settled the debt with Giordano, and Baronick received his fee from Giordano.

### Issues on Appeal

The following summarize the questions of law presented on appeal.

(1) Whether Congress intended the application of 18 U.S.C. § 894 to be restricted only to loan sharking activities by elements of organized crime, thus making its application to Andrino's activities an unconstitutional broadening of the intended scope of the statute;

(2) Whether sufficient evidence was presented to support the verdicts reached by the jury that Andrino was guilty as charged on three of the four counts; and

(3) Whether the consolidation of the two cases for trial by a single jury deprived appellant's rights to a fair trial under the Sixth Amendment.

### Discussion of Law

The express language of the statute in question enervates Andrino's position on the first issue. Section 894(a) provides, *inter alia*, that

> [w]hoever knowingly participates in *any* way, or conspires to do so, in the use of *any* extortionate means
>
> > (1) to collect or attempt to collect *any* extension of credit . . . (emphasis added)

shall be subject to the penalties provided therein. The definitions of those extensions of credit provided in 18 U.S.C. § 891 are equally broad in scope and impact:

> (1) To extend credit means to make or renew *any* loan, or to enter into *any* agreement, tacit or express, whereby the repayment or satisfaction of *any* debt or claim, whether acknowledged or disputed, valid or invalid, *and however arising*, may or will be deferred. (Emphasis added).

Congress defined "an extortionate extension of credit" as

> any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person. 18 U.S.C. § 891(6).

Congress defined "an extortionate means" as

> any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person. 18 U.S.C. § 891(7).

The broad sweep of the extortionate credit statute also has firm foundations in the legislative history of the law. The congressional language in the conference report on the Senate bill (eventually passed in lieu of the House bill) is expansive, not restrictive:

> The full utility of chapter 42 as a weapon in the war on organized crime obviously cannot be assessed until it has been tested in battle. . . . [I]t is not, and is not intended to be, a Federal usury law, nor does it have anything to do with interest rates as such. It is, rather, a deliberate legislative attack on the economic foundations of organized crime. . . . The methods used in the enforcement of [underworld business obligations] are notorious. . . . [T]he conferees wish to leave no doubt of the congressional intention that chapter 42 is a weapon to be used with vigor and imagination against every activity of organized crime that falls within its terms. Conf.Rep.No.1397, 90th Cong., 2d Sess., 2 U.S.Code Cong. & Admin. News p. 2029 (1968).

A more clearly stated, open-ended directive by the legislative branch to the executive branch could not have been phrased.

■ Although the issue was not squarely presented and resolved, the Supreme Court, in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), discussed in dicta the underlying intent of the statute. *Perez* held that the extortionate credit transactions statute, 18 U.S.C. § 891 et seq., as it applied to petitioner (concededly, a "loan sharker") was a permissible exercise by Congress of its powers under the Commerce Clause of the Constitution. The issue here is the reach of that statute— its application to Andrino, who contended on appeal to be nothing more than an ordinary gambling enthusiast. Mere forms and titles aside, it is clear that Congress intended this statute to regu-

late purely intrastate extortionate transactions if, in its judgment, they affected interstate commerce. And, if the threatening " 'evil' " adopts a different "form," the law created to counter it may be extended to embrace it. *See Perez, supra,* 402 U.S. at 154, 91 S.Ct. at 1361. The absence in this case of formal "loans" and of specified "interest" rates, in all their myriad forms, is deemed to be inconsequential insofar as the actual characteristics of the extension of credit, the accrual of a debt, and the manifestation of coercion to collect that extension are sufficiently displayed by the evidence presented.

■ The rejection of similar arguments emphasizing the mere "forms" or differing "techniques" of illicit activity, purportedly beyond the sweep of a remedial statute enacted by Congress, was indicated in United States v. Roselli, 432 F.2d 879, 885 (9th Cir. 1970), rehearing denied (1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971), rehearing denied sub nom. 402 U.S. 924, 91 S.Ct. 1366, 28 L.Ed.2d 665 (1971), where this Court found certain gaming activities at a private social club to be within the reach of the interstate racketeering statute, 18 U.S.C. § 1952. The language on the face of that statute, as in 18 U.S.C. § 894, is broad, not narrow, and expansive, not restrictive— consistent with the intent of Congress to match the ingenuity of the criminal in adopting new, more evasive, "forms" and "techniques." Andrino's overbreadth argument is met by the Supreme Court's conclusion that the statute sufficiently describes the subject class of activities to meet the required definiteness under the Constitution. *Perez, supra,* 402 U.S. at 153–154, 91 S.Ct. at 1360–1361. And, finally, Andrino's argument that his particular activities, although perhaps within the class contemplated by the statute, may not be subject to the criminal proscriptions contained therein appears to be answered in substance by the proposition that once a

rationally defined class of activities has been established the courts have no power to excise therefrom individual instances. *Perez, supra,* 402 U.S. at 154–155, 91 S.Ct. at 1361.

▬ Andrino segregated his argument on the second issue into three separate attacks on the individual "incidents," challenging the sufficiency of the evidence in general, and the variance of the evidence presented on the Bourassa count with the Government's response to the bill of particulars. The appellate court may inquire whether the evidence, considered in a light most favorable to the Government, permitted a rational conclusion by the jury that the accused was guilty beyond a reasonable doubt. The test is not whether the evidence must exclude every possibility but that of guilt. United States v. Nelson, 419 F.2d 1237, 1242 (9th Cir. 1969). Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable. *Nelson, supra,* 419 F.2d at 1239. Contentions as to the credibility of witnesses are to be resolved in favor of the jury's findings. United States v. Haili, 443 F.2d 1295, 1299 (9th Cir. 1971). Applying these principles to the jury's finding as to the second count of the first indictment (the "Sbrocca incident"), this Court cannot conclude insufficiency of evidence to sustain a conviction under the statute.

▬▬ Similarly, the insufficiency of evidence argument is unpersuasive pertaining to the jury's finding as to the first count of the first indictment (the "Bourassa incident"). Any inconsistencies with prior positions in Bourassa's testimony were resolved by the jury, and this Court does not find those resolutions unsupportable in light of the record and under the standards of review. *See* discussion, *supra.* Andrino's argument that the Government's response to the bill of particulars did not sufficiently apprise him as to testimony subsequently given by Bourassa which went beyond that response (concerning implicit threats to his family) is without merit. The testimony did differ from the response given, but only slightly, and it is very difficult to accept the suggestion that Andrino's trial tactics would have been substantially altered had he been given prior notice of the precise subject matter of that particular threat which had been conveyed to Bourassa. A defendant is entitled to a bill of particulars insofar as it is necessary to enable him to prepare adequately for a defense—its fundamental purpose being the avoidance of surprise at trial. Williams v. United States, 289 F.2d 598, 600–601 (9th Cir. 1961). However, under the circumstances of this case, there is an insufficient demonstration that Andrino was actually surprised, or that his defense was significantly prejudiced by any variance that occurred.

▬ With respect to the second count of the second indictment (the "Morrison incident") Andrino contended that there is absolutely no evidence connecting him with the events at the cocktail lounge, relying principally upon the assertion that there was no positive identification of him as the bookmaker Morrison contacted on the phone. Under the circumstantial evidence adduced at trial, it was a reasonable inference for the jury to draw that Andrino was operating in concert with Giordano and Baronick. Since there was independent evidence establishing this relationship between Andrino, Giordano and Baronick, Baronick's testimony as to Giordano's knowledge of Andrino's complicity in the cocktail lounge affair was admissible as an exception to the hearsay rule. United States v. Adams, 446 F.2d 681, 683 (9th Cir. 1971).

▬ There are no inconsistencies in the jury's split verdict as to the counts alleged in the "Morrison incident." United States v. Puchi, 441 F.2d 697, 702 (9th Cir. 1971), rehearing denied (1971), cert. denied, 404 U.S. 853, 92 S. Ct. 92, 30 L.Ed.2d 92 (1971); *see* Unit

ed States v. Manglona, 414 F.2d 642, 645 (9th Cir. 1969).

Finally, the recent Tenth Circuit case, United States v. Briola, 465 F.2d 1018 (10th Cir. 1972), rehearing denied (1972), cert. denied, 409 U.S. 1108, 93 S. Ct. 908, 34 L.Ed.2d 688 (1973), is distinguishable insofar as the time sequence in that case raised a question as to Briola's knowledge of the subordinate, Meyer, utilizing a different name in placing the bets. There is no similar time sequential dilemma in this case. The evidence is clear that Andrino had the requisite knowledge of the creation of the debts, and that he subsequently manipulated the use of force against the debtors in such a manner as to merit the inference that he was primarily responsible for the physical and mental abuse of the debtors following the extension of the credit.

Andrino's final contention regarding consolidation of the two indictments is equally without merit. The evidence relating to the several crimes charged tended to demonstrate a common "scheme or design" embracing those independent, yet related crimes, and tended to establish his complicity in their commission. Smith v. United States, 173 F.2d 181, 185 (9th Cir. 1949); *accord,* Tandberg-Hanssen v. United States, 284 F.2d 331, 333 (10th Cir. 1960). Any potential errors latent in the consolidation of the two cases was more than compensated for by adequate opportunity for cross-examination, and by limitation of jury instructions. United States v. Gary, 447 F.2d 907, 909–910 (9th Cir. 1971), rehearing denied (1971). That the jury acquitted Andrino of the first count in the second indictment evidences their discernment of the factual issues in the case, the ability of counsel to control presentation, and the propriety and strength of the trial court's instructions. There was no prejudice in ordering consolidation of the two cases for single trial.

Accordingly, the judgment of conviction as to the three counts is affirmed.