OPINION
{¶ 1} Defendant-appellant, Lindsey J. Bruce ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas, entered upon a jury verdict convicting him of one count of kidnapping, in connection with the disappearance of five-year-old Emily Rimel ("Emily").
 {¶ 2} The following relevant facts are gleaned from the record. According to Emily's mother, Jane Rimel ("Jane"), on December 6, 2004, she resided at 4474 Reinbeau Drive in Columbus, with her daughter, Emily, her fiancé, Brent Copley ("Brent"), and the couple's son, Travis, whose nickname is Bubby ("Bubby"). The family shared a one-bedroom apartment in which the children shared the bedroom and Jane and Brent slept on a bed located in the living room/dining room area.
 {¶ 3} Brent testified that he had known appellant for ten years and considered appellant a friend. Jane stated she became acquainted with appellant through Brent. Brent testified that appellant was well known to Emily and Bubby, and Emily would give appellant a friendly hug when he stopped by. Appellant would sometimes stay at the couple's apartment at night when he had been drinking heavily and was too inebriated to drive home.
 {¶ 4} Both Jane and Brent testified that when appellant left the apartment, he would always wake someone up so that they could lock the front door behind him. Brent, in particular, testified insistently at trial that appellant never left without waking someone up. Both Jane and Brent testified that Brent was a heavy sleeper, but Brent explained, "there are certain ways to wake me up. [Appellant] knew ways to get me up[.]" (Tr., 76.)
 {¶ 5} In December 2004, Brent worked during the day and Jane worked from midnight to 8:00 a.m. On the night of December 6, 2004, Brent drove Jane to work at 11:45 p.m. This was the last time that Jane saw Emily. Brent's mother, Freda Copley ("Freda") stayed with the children while Brent took Jane to work. Freda lived around the corner in the same apartment complex. She testified that normally when she would watch the children while Brent took Jane to work, she would do so at her apartment. However, on the evening of December 6, 2004, she went to Jane and Brent's apartment because Emily was sick with a "bad cold." Both Jane and Brent also testified that Emily had not been feeling well that evening.
 {¶ 6} Brent returned at approximately 12:10 a.m., whereupon his mother left and he put Emily to bed. Bubby fell asleep a short time later. Brent testified that he was awakened sometime between 1:00 and 2:00 a.m. when appellant came to the door. Appellant asked whether Brent had any "junk food" in the house and Brent replied that he did not. After a few minutes, appellant left and Brent stayed up watching television. According to Brent, appellant returned after about one hour and fell asleep on the couch. Brent locked the door to the apartment and went to bed. Brent testified that appellant was wearing jeans, a white or gray T-shirt, and a black leather jacket.
 {¶ 7} Brent testified that he next awoke at 8:00 a.m. Appellant was gone and the front door was unlocked. When he went in to awaken Emily so that he and the children could pick up Jane, he realized that Emily was missing from her bedroom. He searched for Emily throughout the apartment and also at his mother's nearby home, but could not find Emily. Emily's only pair of shoes and the only coat she owned were still at home. Brent's mother confirmed that Brent came to her home on the morning of December 7, 2004, at approximately 8:00 a.m., and told her that Emily was missing. Brent testified that Emily would not just leave home alone. Jane, too, testified that Emily had never run away and would never have left the house on her own.
 {¶ 8} Brent left Bubby with his mother and picked up Jane from work, whereupon he informed her that Emily was missing. Jane had the apartment manager call the police and Officer James Galvin ("Officer Galvin") and Detective Warren Tyler ("Detective Tyler"), both of the Madison Township Police Department, responded to the call. Detective Tyler issued an Amber Alert for Emily and interviewed Brent and Jane.
 {¶ 9} Special Agent William Hatfield ("Agent Hatfield"), of the Crime Scene Unit of the Major Crimes Division of the Ohio Bureau of Criminal Identification and Investigation ("BCI") was dispatched to the Rimel-Copley home. Agent Hatfield obtained a DNA standard from Jane and also collected DNA from Brent through the use of oral, hand and penile swabs. Hatfield also inspected Brent's body and testified that he found no marks, wounds, or other evidence of a struggle or fight. Hatfield also obtained a DNA standard from Jane's cousin, Lila Wright ("Lila"), who was also appellant's girlfriend. Hatfield also searched the Rimel-Copley home and Brent's vehicle for trace evidence.
 {¶ 10} Franklin County Sheriff's deputies went to the Fairwood Avenue address of appellant's mother, where appellant also resided, but appellant was not there. Appellant's mother consented to a search of her home for the purpose of looking for appellant, and to a subsequent search, again for the purpose of determining whether appellant was in the house.
 {¶ 11} When appellant returned home later that morning, he spoke with Lila via telephone; she informed him that the police were looking for him and wanted to speak with him. Lila handed the telephone to a police officer, and appellant told the officer that he was at home. Moments later, police officers from Madison Township and Columbus arrived at his home. He went out onto the porch and spoke with them, and then consented to a search of his car. Appellant agreed to an interview at the Madison Township Police Department, which began at approximately 2:00 p.m. on December 7, 2004.
 {¶ 12} Roughly 13 hours later, pursuant to a search warrant, Agent Hatfield collected DNA from appellant via penile, oral and finger swabs. These DNA samples were analyzed and compared to a known DNA profile of Emily that had been taken in connection with an earlier paternity proceeding in Muskingum County. While collecting the DNA samples from appellant, Hatfield noticed several cuts on appellant's fingers, some of which appeared to be fresh, and also noticed an injury on appellant's arm. He took photographs of these wounds, which were admitted at trial as Exhibits J-1 through J-3.
 {¶ 13} Hatfield also searched appellant's vehicle. He testified that though the vehicle was cluttered and the floor was dirty, the seats were very clean. He found a bottle of Armor All polish in the back seat of the vehicle and it appeared and felt as if Armor All had recently been used on the front and back seats. Photographs of the interior of appellant's car were admitted at trial as State's Exhibits "K-2" through "K-9" and "K-11" through "K-16." Hatfield testified that the application of Armor All to the car's interior would be detrimental to retrieval of any DNA or hair that might have been on the seats. Authorities conducted a third search of appellant's home, this time pursuant to a search warrant, and also searched the auto repair garage where appellant worked.
 {¶ 14} Meanwhile, police searched for Emily. After analysis of the DNA samples was complete, Detective Tyler obtained a warrant for appellant's arrest on December 17, 2004. At trial, BCI DNA analyst Diane Gehres ("Gehres"), testified that the sample taken from appellant's penis contained a mixture of male and female DNA. Jane and Lila were excluded as the female contributor, but Emily could not be excluded as the source of the female DNA. She testified that the female DNA was not conclusively that of Emily, but it was consistent with Emily's DNA. Gehres testified that if she sampled 26,930 people there would be only one person among them that would not be able to be excluded.
 {¶ 15} On December 27, 2004, the Franklin County Grand Jury indicted appellant on one count of kidnapping in violation of R.C. 2905.01, and one count of rape in violation of R.C. 2907.02, both felonies of the first degree. Appellant's eight-day trial began on September 14, 2005. At that time, Emily remained missing.
 {¶ 16} Antonio Kendrick ("Kendrick") testified that he, his cousin Eugene, and appellant went to a pool hall called "Cornfed Red's" on the night of December 6, 2004. Kendrick identified a Cornfed Red's surveillance photograph showing the three entering the pool hall at approximately 11:53 p.m. that night. He testified that appellant was wearing a leather jacket, a white T-shirt and blue jeans. Another surveillance photograph showed the three leaving Cornfed Red's at 1:42 a.m. on December 7, 2004. Kendrick stated that he rode with appellant to the Rimel-Copley residence, whereupon appellant went inside the residence for approximately five to seven minutes while Kendrick waited in the car. Appellant then returned to the car and took Kendrick home. This was the last Kendrick saw of appellant that night.
 {¶ 17} Patrick McCloud ("McCloud") met appellant while the two were housed together in a "tank" in the Franklin County Jail. A "tank" contains 12 individual cells that open up into a common area. McCloud testified that appellant told him that appellant had tried to "admit [to authorities] what he done" but that his attorney "wouldn't let him[.]" (Tr., 228.) On a separate occasion, McCloud overheard appellant tell another inmate that he wanted to open up and felt remorseful. McCloud also heard appellant tell the other inmate that appellant is a sex addict and that he "got drunk and he raped a little girl. Before he knew what happened, you know, it was too late." (Tr., 229.) McCloud received no benefit in exchange for providing his testimony.
 {¶ 18} Thomas Coverdale ("Coverdale") testified that he was also housed in the Franklin County Jail with appellant. On appellant's first night there, appellant made statements admitting he had raped and killed a little girl. Coverdale asked appellant where the girl was and appellant replied that his attorney had told him not to tell anyone. Coverdale, too, received no benefit in exchange for his testimony. On cross-examination, he admitted that he disliked appellant and that while the two were incarcerated together, he threatened appellant, stole appellant's food, and threw urine on appellant's bed.
 {¶ 19} John Tomlinson ("Tomlinson") was also an inmate in the Franklin County Jail. When appellant arrived at the jail, Tomlinson approached him and asked whether he was "the guy that raped and killed that little girl" and appellant replied, "[y]eah." (Tr., 275.) Tomlinson testified that on another occasion appellant said that he could not believe what he had done because the girl's parents were his best friends.
 {¶ 20} According to Tomlinson, "[appellant] said that he was a sex addict and * * * had a drinking problem and that he was really messed up that night." (Tr., 278.) Appellant tearfully told Tomlinson that "the devil was in him" (Tr., 278) and that "he was having sex with [Emily] when he * * * looked down and he realized what he had done and * * * [then] panicked." (Tr., 279.) On cross-examination, Tomlinson testified that appellant did not tell him specifically what sexual act he engaged in with Emily, nor did appellant specify where and when the act took place.
 {¶ 21} When Tomlinson told appellant that he should tell authorities where Emily's body was, appellant replied that he had already tried to do that. After this conversation between Tomlinson and appellant, appellant called Detective Tyler. Later, appellant left his cell for a meeting with authorities and with his attorney. When he returned, Tomlinson and others approached him to congratulate him for telling the truth, and he told Tomlinson that he had intended to tell the authorities where Emily's body was, but said, "[t]hey won't let me confess. They won't let me tell them where the body is." (Tr., 283.) Appellant said, "[m]y attorney says no body, no murder." (Tr., 286.) He also told Tomlinson that his attorney had advised him that, "I could have got that [DNA] off the toilet." (Tr., 286.)
 {¶ 22} After hearing on the news that police were searching in the frozen Darby Creek for Emily, Tomlinson told appellant that he should tell them if she was in the creek, whereupon appellant replied, "[s]he's not in there." (Tr., 290.) Appellant told Tomlinson, "I picked her up and I took her and I don't even know that she was dead." (Tr., 290.) After appellant changed from referring to her as "Emily" to referring to "the body" Tomlinson again asked whether Emily was dead, and appellant replied, "I'm not even sure if she's dead." (Tr., 290.)
 {¶ 23} On cross-examination, Tomlinson admitted that he had just begun serving a four-year sentence and planned to apply for judicial release as soon as he was eligible, and that he had contacted members of the media to advise them of appellant's admissions.
 {¶ 24} Earl Anderson ("Anderson") was housed two cells away from appellant in the segregation-cell area of the Franklin County Jail. Anderson testified that appellant told him that "he don't know why he did what he did, but he came home drunk" and went into Emily's bedroom because he and Lila used to "kick it sexually" in that room, and that "he did what he did" with "the little girl" in the bedroom. (Tr., 326.) He told Anderson that "he had sexual intercourse with the little girl." (Tr., 327.) According to Anderson, appellant said that "he had sexual intercourse, she threatened to tell, and he said he choked her" and then "wrapped her up in the sheet and took her out of the house". (Tr., 327-328.) Appellant said that after he left Emily's apartment he planned to go see his girlfriend (Lila), who lived in Zanesville, to see if she could help him but, Anderson said, appellant never disclosed where he put Emily's body. Appellant told Anderson, "as long as nobody knew where the body was, they couldn't get him." (Tr., 328.)
 {¶ 25} Laura Herbst ("Herbst"), owns a grocery store in Brownsville, Ohio, which is located east of Columbus along Interstate 70. Herbst testified that her store opens at 7:00 a.m. On a morning in December 2004, as she was arriving for work, she saw a burgundy/red vehicle pulling out of a nearby garbage dump. She thought that this was odd because there are three entrances to the dump, and in the 13 years that she has lived in that area the entrance that the burgundy/red car used had always been locked and she had never seen any cars use it. Herbst was unsure of the exact date that this occurred. On cross-examination she admitted that she did not see the driver of the car that day, but on direct examination she testified that photographs of appellant's car, marked as State's Exhibits Q-1 through Q-4, looked like the same car she had seen that December morning.
 {¶ 26} Herbst testified that she remembered appellant coming into her store that same morning to inquire as to the location of the nearest gas station. She positively identified appellant as the man who had come into her store that morning. Herbst recalled that appellant was wearing jeans, a white T-shirt and a silver chain pictured in State's Exhibit "P." She stated that appellant stood out in her mind because most patrons "like to talk for a minute" (Tr., 347) but appellant hurriedly left the store. When he left, she "followed him out the door because it just hit [her] as odd. But by the time [she] got out there, he was gone." (Tr., 348.) Detective Tyler testified that the Brownsville exit is the least populated, least traveled exit on Interstate 70 between Columbus and Zanesville.
 {¶ 27} On cross-examination, Detective Tyler acknowledged that police took a significant number of items from the Rimel-Copley home, and thoroughly searched appellant's home, vehicle and auto repair shop, but that, other than the penile DNA swab, those searches uncovered no physical evidence that implicated appellant in Emily's disappearance.
 {¶ 28} Following the trial court's denial of his Crim.R. 29 motion for dismissal, appellant presented his case. Floyd Bruce, appellant's brother, testified that appellant cooperated with police on December 7, 2004, and that appellant did not flee in the days preceding his arrest. Mike Bruce, appellant's brother, confirmed Floyd Bruce's testimony and added that police conducted three searches of the residence that appellant shared with his brother and other family members. Carrylann Bruce, appellant's mother, confirmed that authorities conducted various searches of the family home, and testified that appellant was not at home when police first arrived on December 7, 2004.
 {¶ 29} Appellant testified on his own behalf. He confirmed that he and two friends went to Cornfed Red's between 11:30 p.m. on December 6, 2004, and 12:00 a.m. on December 7, 2004. He stated that the three stayed at the bar until the bar closed. He claimed that he consumed only two drinks that night. He stated that when he left the bar he went to the Rimel-Copley home, where he conversed with Brent for approximately five minutes, then told Brent he would return later.
 {¶ 30} He testified that he dropped off his friends and returned to Emily's residence at approximately 3:30 a.m. He stated that the front door was unlocked when he arrived, so he entered, used the bathroom to urinate, then sat down on the couch. He stated that he tried to talk to Brent, who was dozing while Bubby was running around the house. Appellant confirmed that he had stayed overnight at the house in the past. He denied that he always woke someone up before leaving so that they could lock the door.
 {¶ 31} According to appellant, after his attempts to converse with Brent were unsuccessful, he told the half-asleep Brent to lock the door, he left the house and went home. He testified that he arrived at his house between 4:00 and 4:30 a.m. He changed his clothes and then went to his garage to do some vehicle repair work. Appellant explained that it was not unusual for him to engage in this type of work at such an early hour of the morning. He fell asleep at the garage, which also was not unusual, according to appellant. Upon awakening, he ran errands at an auto parts store and a junkyard, then proceeded to a friend's house. While he was at the friend's house, appellant's brother called to inform him that the police were looking for him, whereupon he returned home.
 {¶ 32} Appellant denied having ever confessed to fellow inmates, but noted that he had been harassed and threatened by some inmates. He denied raping and kidnapping Emily. He testified that he keeps many bottles of Armor All in his garage and his car, and that he had applied Armor All to the seats of his car before going to Cornfed Red's on December 6, 2004. On cross-examination, appellant admitted that after he was arrested he called Detective Tyler and told him that he wanted to "get this behind me" but explained that this statement was a response to Detective Tyler's prompting.
 {¶ 33} In rebuttal, the state offered the testimony of Federal Bureau of Investigation ("FBI") agent Curtis Collins ("Agent Collins"). Agent Collins testified that he and others had interviewed appellant on the night of his arrest. At one point during the interview, appellant began talking about doing "stupid things" and said that he has blackouts. Agent Collins then asked appellant "[w]hat was the stupidest thing you've ever done in your life?" and appellant replied, "[w]ell, you already know that. Otherwise I wouldn't be here." (Tr., 521.)
 {¶ 34} Finally, FBI agent Tim Creedon ("Agent Creedon") testified that after appellant's arrest he stated that he wished he hadn't been drinking the night of Emily's disappearance, and that he wanted to help bring this matter to a conclusion. On cross-examination, Agent Creedon testified that he never made a written report of these statements.
 {¶ 35} Following their deliberations, the jury returned a verdict of guilty as to the kidnapping charge and not guilty as to the rape charge. The court sentenced appellant to a prison term of ten years and determined that appellant is a sexual predator. Appellant timely appealed and presents one assignment of error for our review, as follows:
THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 36} In support of his single assignment of error, appellant contends that the evidence was insufficient to prove, beyond a reasonable doubt, that appellant removed Emily from her home to any other place. Similarly, with respect to manifest weight, he argues that the evidence presented at trial wholly failed to establish that he took Emily from her home, and that the jury convicted him solely based on the circumstance that he was one of the last adults to be seen with Emily.
 {¶ 37} The Supreme Court of Ohio outlined the role of an appellate court presented with a sufficiency of evidence argument in State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
See, also, Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 38} This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983),20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Rather, the sufficiency of evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, supra, at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79, 80,434 N.E.2d 1356. The reviewing court does not substitute its judgment for that of the factfinder. Jenks, supra, at 279.
 {¶ 39} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541.
 {¶ 40} The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass
(1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The power to reverse on "manifest weight" grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the conviction."Thompkins, supra, at 387.
 {¶ 41} Appellant was convicted of kidnapping in violation of R.C. 2905.01(A), which provides, in relevant part:
No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
(1) To hold for ransom, or as a shield or hostage;
(2) To facilitate the commission of any felony or flight thereafter;
(3) To terrorize, or to inflict serious physical harm on the victim or another;
(4) To engage in sexual activity, as defined in section 2907.01
of the Revised Code, with the victim against the victim's will[.]
 {¶ 42} Appellant's sufficiency and manifest weight arguments focus on the first element of the crime of kidnapping as charged in the indictment, which required that the state prove, beyond a reasonable doubt, that appellant "remove[d] [Emily] from the place where [she was] found." He contends that the inmates who testified to appellant's confessions are themselves seriously lacking in credibility because they have been charged and/or convicted of serious felonies and face substantial prison sentences. He notes that Coverdale in particular demonstrated bias when he admitted he dislikes appellant so much that he threatened appellant and threw urine on his bed.
 {¶ 43} Appellant also argues that there is no physical evidence that he removed Emily from her home. There were no signs of a struggle in the home and investigators found no marks, hair fibers or semen linking appellant to Emily, despite exhaustive searches of the Rimel-Copley apartment and appellant's home and vehicle.
 {¶ 44} We note at the outset that a criminal conviction can be based solely on circumstantial evidence. State v. Nicely
(1988), 39 Ohio St.3d 147, 151, 529 N.E.2d 1236. "[P]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others." State v. Griffin (1979),13 Ohio App.3d 376, 377, 13 OBR 458, 469 N.E.2d 1329, quoting 1A Wigmore, Evidence (Tillers Rev. 1983) 944, Section 24 et seq. "Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable."Nicely, supra, at 151, quoting United States v. Andrino
(C.A.9, 1974), 501 F.2d 1373, 1378.
 {¶ 45} In this case, the jury was presented with undisputed evidence that Emily was ill on the evening she disappeared, she was only five years old, she left home in the middle of a December night without the only coat and pair of shoes she had, and she had never left home on her own in the past. This evidence is sufficient to support the conclusion, by a rational trier of fact, that Emily did not leave home on her own, but instead was removed from her home by another.
 {¶ 46} Moreover, the evidence is sufficient to support the jury's finding that it was appellant who removed Emily. Appellant denied having done so, but the jury was free to disbelieve him.State v. Woodward, 10th Dist. No. 03AP-398, 2004-Ohio-4418, ¶ 18. Appellant was present in Emily's home during part of the time period within which Emily disappeared. He left when Brent was asleep and, unlike every other similar instance, he left without waking Brent so that Brent could lock the door. Emily could not be excluded as the source of the female DNA found on appellant's penis, while Jane (the only female other than Emily who resided in the home) and Lila (who was appellant's girlfriend) were excluded.
 {¶ 47} Appellant was observed with fresh scratches on his hands the day of Emily's disappearance, and Herbst's testimony placed appellant at a little-traveled exit off of I-70 between Columbus, where Emily lived, and Zanesville, where appellant's girlfriend lived. The state presented the testimony of several witnesses that, if believed, demonstrated that appellant had confessed to raping, kidnapping and killing Emily. Finally, appellant demonstrated consciousness of his own guilt when he told Detective Tyler that he wanted to "[g]et this behind me." The testimony of McCloud and Tomlinson confirmed that, while incarcerated, appellant had desired to confess but his attorney dissuaded him from doing so.
 {¶ 48} The evidence adduced was sufficient to support the jury's verdict of guilty on the charge of kidnapping, and the verdict was not against the manifest weight of the evidence. Accordingly, appellant's sole assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Petree and McGrath, JJ., concur.