**[Cite as *State v. Boyd*, 2025-Ohio-984.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30098 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 00291 |
| | : | |
| DYLAN BOYD | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 21, 2025

. . . . . . . . . . .

JOHNNA M. SHIA, Attorney for Appellant

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Defendant-Appellant Dylan Boyd appeals from his conviction in the Montgomery County Court of Common Pleas after he was found guilty of having weapons while under disability and its attendant firearm specification. He was sentenced to six years in prison plus the 713 days remaining on his post-release control. For the reasons

that follow, the judgment of the trial court will be affirmed.

## I.     Facts and Procedural History

{¶ 2} In January 2023, Boyd contacted E.M. to let him know that he was going to be in town. The two had been friends in high school, but after spending the last several years in different states (E.M. in Ohio and Boyd in Texas), contact between them had been intermittent. Growing up, the pair played sports together, spent the night at each other's houses, and got to know each other's families. E.M. said that Boyd "was my dog, we was cool; we were super tight." Trial Tr. at 168. Boyd and E.M. made plans to hang out.

{¶ 3} On the evening of January 14, 2023, Boyd and his girlfriend, Zenia Thomas, went to E.M.'s home in Huber Heights, which he shared with his girlfriend and daughter. Boyd, who is trained as a barber, was going to cut E.M.'s hair. Boyd and Thomas arrived between 7 and 8 p.m. in a white SUV, and E.M. introduced Boyd to his daughter as "Uncle Dylan." E.M. and Boyd chatted while E.M.'s hair was being cut, but E.M. thought his friend was acting strangely. "[L]ooking back there was a lot of stuff that was weird that I just brushed off because like I said, like it's my dude. But it's just like the look he had on his face like even when he shook my hand . . . you could tell his mind was somewhere else." Trial Tr. at 174-175. Boyd and Thomas left around 10 p.m. and with plans to meet up later with E.M.

{¶ 4} Later that night, Boyd Facetimed E.M. and told him to meet at Boyd's grandmother's house. E.M., along with another friend, arrived at Boyd's grandmother's house between 1 and 2 a.m. and parked beside Boyd's white SUV in the driveway. E.M.

got out and went to the door, but kept the car running because his friend, Josh Williams, was still in the car.

{¶ 5} E.M. knocked on the front door and Boyd answered, but as E.M. entered, Thomas exited. The two men spent a couple minutes inside and then walked back out of the house to meet Boyd's brother at a different location. As E.M. began walking toward his car with Boyd trailing behind, he felt a gun on the back of his head. The next thing E.M. knew, he woke up on the ground beside his still-running car with blood everywhere. Everyone else had left. He then wrapped his sweater around his head and managed to drive himself to Miami Valley Hospital. E.M. explained that "it felt like my head was about to pop. Like my head was swelling up so bad. Like my brain shifted up to my skull and it was swelling up." Trial Tr. at 203.

{¶ 6} E.M. had been shot in the head and his injuries were severe. He testified that doctors had to cut out a part of his skull to relieve the swelling and that he had to wear a helmet for a time to protect his brain. He also endured multiple surgeries during his 10-day stay in the hospital.

{¶ 7} A police investigation led to Boyd's indictment on two counts of aggravated robbery (Counts One and Two), two counts of felonious assault (Counts Three and Four), one count of having weapons while under disability (Count Five), and one count of attempted murder (Count Six). Each aggravated robbery and felonious assault charge had an attendant three-year firearm specification and repeat violent offender specification. The weapons under disability count had an attached three-year firearm specification.

{¶ 8} On October 11, 2023, Boyd filed a jury waiver on the weapons under disability charge (Count Five) and the repeat violent offender specifications on Counts One through Four.

{¶ 9} The case progressed to a jury trial on March 4, 2024. After several days of testimony, Boyd was found not guilty of both counts of aggravated robbery, both counts of felonious assault, and attempted murder. After a bench trial on March 15 on the weapons under disability count, the trial court found him guilty of both the underlying charge and the firearm specification. Boyd was sentenced to 36 months for having a weapon while under disability, a mandatory three years for the firearm specification (to be served prior to and consecutively to the underlying count), and the remaining 713 days of post-release control from a prior conviction in 2012.

{¶ 10} Boyd has appealed, raising six assignments of error.

## II. Jurisdiction to try the firearm specification

{¶ 11} In his first assignment of error, Boyd argues that the trial court lacked jurisdiction to try him on the firearm specification because his jury waiver was only for the underlying charge of having weapons while under disability, not the specification. We disagree.

{¶ 12} According to R.C. 2945.05, in all criminal cases, a defendant may waive a jury trial and instead be tried by the court. To be effective, the waiver must be "(1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court." *State v. Lomax*, 2007-Ohio-4277, ¶ 9. Courts must strictly comply with these requirements. *State v. Grier*, 2010-Ohio-5751, ¶ 15 (2d Dist.). Further, "[a] jury

waiver must be voluntary, knowing, and intelligent." *State v. Bays,* 87 Ohio St.3d 15, 19 (1999).

{¶ 13} Boyd does not appear to challenge the voluntariness of his jury waiver; the waiver was made in open court, in writing, was signed by Boyd, was made part of the record, and was filed with the clerk. Instead, he contends that the waiver only covered the having weapons under disability charge, not the firearm specification. The implication, according to Boyd, is that the trial court did not have jurisdiction to hear the specification.

{¶ 14} A firearm specification cannot be tried on its own because "[it] is, by its very nature, ancillary to, and completely dependent upon, the existence of the underlying criminal charge or charges to which the specification is attached." *State v. Nagel*, 84 Ohio St.3d 280, 286 (1999). It is a "penalty enhancement" for the predicate offense, not its own criminal offense. *State v. Ford*, 2011-Ohio-765, syllabus. Further, the statutory language in R.C. 2929.14(B)(1)(a) indicates that the imposition of a prison term for a firearm specification is contingent upon a conviction of a felony.

{¶ 15} Boyd's proposition that he waived a jury trial on only the having weapons under disability charge and not the specification would create an absurd result. In that scenario, the jury would have before it a "disembodied" or "orphaned" specification. The jury would have had the attempted murder, aggravated robbery and felonious assault counts (with their specifications) to consider, and then a seemingly random specification referencing a non-existent "aforesaid offense."

{¶ 16} Because the firearm specification was dependent on the underlying having weapons while under disability charge, the trial court had jurisdiction to try Boyd on both.

His first assignment of error is overruled.

### III. Collateral Estoppel and Ineffective Assistance of Counsel

{¶ 17} Next, Boyd claims that the "State's successive prosecution for [having weapons while under disability] and the attached gun specification was barred by collateral estoppel" and that trial counsel was ineffective for not moving for dismissal. Appellant's Brief at 12.

<u>Collateral Estoppel</u>

{¶ 18} The United States Supreme Court held that collateral estoppel is embodied in the Fifth Amendment's guarantee against double jeopardy. *State v. Eason*, 2016-Ohio-5516, ¶ 56 (8th Dist.), citing *Ashe v. Swenson,* 397 U.S. 436, 445-446 (1970). The Double Jeopardy Clause of the United States Constitution declares that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb," and similarly, Article I, Section 10 of the Ohio Constitution provides that "[n]o person shall be twice put in jeopardy for the same offense." The protections given by the Ohio and United States Constitutions are coextensive. *State v. Martello*, 2002-Ohio-6661, ¶ 7.

{¶ 19} In practice, "[t]he Double Jeopardy Clause protects against three abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *State v. Ruff*, 2015-Ohio-995, ¶ 10.

{¶ 20} Boyd argues that, because he was tried and acquitted by the jury of aggravated robbery, felonious assault, and attempted murder, he could not be tried by the court on another count (having weapons while under disability) based on the same

set of facts. He is mistaken.

{¶ 21} The keystone of the double jeopardy protection is that a person cannot be tried or punished more than once for the *same offense.* In this case, Boyd was tried before the jury and found not guilty of two counts of aggravated robbery, two counts of felonious assault, and one count of attempted murder. Under the Fifth Amendment, he could not have been tried again for those crimes. However, Boyd was not tried by the jury for having weapons while under disability, as he waived his right to a jury trial on that offense.

{¶ 22} Further, the double jeopardy clause is not implicated with the seemingly inconsistent verdicts reached in the two trials. "The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *State v. Lovejoy*, 79 Ohio St.3d 440, 446 (1997). Boyd chose to have the having weapons while under disability count tried by the court. "The court is its own fact-finder in such a situation . . . [and] is not prohibited from finding a defendant guilty of having weapons while under disability after a jury finds him not guilty of certain offenses during which he was said to have possessed a gun." *State v. Hudson*, 2017-Ohio-645, ¶ 17 (7th Dist.). *Accord State v. Wellman*, 2015-Ohio-4875, ¶ 6 (10th Dist.) (issue preclusion does not prevent the court from finding a defendant guilty of having weapons while under disability after a jury found him not guilty of felonious assault).

Ineffective Assistance of Counsel

{¶ 23} Boyd also asserts that his trial counsel was ineffective for not raising these

issues. To prevail on an ineffective assistance of counsel claim, Boyd must prove that his attorney was ineffective under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The test has two parts. First, he must show that counsel's performance was deficient. *Id.* at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

{¶ 24} With respect to the first prong, much deference is given to trial counsel. "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." *State v. Bird*, 81 Ohio St.3d 582, 585 (1998). To demonstrate prejudice, the second prong, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1998), paragraph one of the syllabus.

{¶ 25} We have already concluded that there were no double jeopardy or collateral estoppel problems in this case, and because of that, we cannot conclude that Boyd's trial counsel made any errors, let alone ones so severe that they rose to the level of being constitutionally deficient. Boyd's second assignment of error is overruled.

### IV.     Manifest weight and sufficiency of the evidence

{¶ 26} In his third assignment of error, Boyd asserts that his conviction was based on insufficient evidence and against the manifest weight of the evidence.

<u>Sufficiency of the Evidence</u>

{¶ 27} "[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). It is essentially a test of adequacy: whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.*

{¶ 28} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 2010-Ohio-5160, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A conviction based on legally insufficient evidence constitutes a denial of due process and will bar a retrial. *Thompkins* at 386-387.

Manifest Weight of the Evidence

{¶ 29} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st

Dist. 1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs *heavily* against the conviction.' " (Emphasis added.) *Id.*

**{¶ 30}** "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). *Accord State v. Winbush*, 2017-Ohio-696, ¶ 58 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

**{¶ 31}** To secure a conviction for having weapons while under disability, the State had to prove that Boyd (1) had been convicted of a felony offense of violence, and (2) that he had knowingly acquired, had, carried, or used a firearm. R.C. 2923.13(A)(2). Additionally, to prove the firearm specification, it had to show that Boyd, in committing having weapons under disability, had, displayed, brandished, indicated that he possessed, or used the firearm to facilitate the offense. Because there is no question that Boyd was a felon who had previously been convicted of committing an offense of violence, the analysis is only whether there was evidence to establish that he had knowingly acquired, had, carried, or used a firearm.

**{¶ 32}** At trial, E.M. testified that throughout the evening of January 14, 2023, Boyd had acted strangely. "[L]ooking back there was a lot of stuff that was weird that I just

brushed off because, like I said, [that's] my dude. But it's just . . . the look he had on his face . . . even when he shook my hand . . . you can tell his mind was somewhere else." Trial Tr. at 174-175. E.M.'s feeling that something was "off" about Boyd continued when he arrived at Boyd's grandmother's house. In fact, while inside the house, he texted Williams (who was sitting in the car waiting for E.M. to return) that something was wrong.

{¶ 33} E.M. then told the jury that, as he exited the house, Boyd was following close behind, and suddenly E.M. felt a gun on the back of his head. E.M. knew it had to be Boyd holding the gun because they were the only two outside in the driveway at that time; Williams and Thomas were sitting in separate cars by then. He also testified that it was Boyd who told him, "You already know what this is," to which E.M. replied, "Man, you can have that shit." Trial Tr. at 198. E.M. stated that that he took Boyd's comment to mean that it was a robbery, so he put his hands up in the air. He further admitted at trial that he was wearing a $30,000 necklace at the time, had a baggie of Percocets with him, and typically carried a large amount of cash.

{¶ 34} In the hours after being shot but before losing consciousness at the hospital, E.M. told multiple people, including his girlfriend, Williams, and a nurse, that Boyd had been the shooter. "I needed somebody to know something because . . . I was fading in and out of consciousness. I didn't know if I was about to survive." Trial Tr. at 206.

{¶ 35} In addition to E.M.'s stating that Boyd was his shooter, Williams testified that, while he did not see the gun from his position in the front seat of E.M.'s car, he saw E.M. put his hands in the air, ask for mercy, and then heard a gunshot. Trial Tr. at 384-391.

{¶ 36} Nevertheless, Boyd argues that the conviction based on circumstantial evidence should not stand.

{¶ 37} A conviction can be obtained solely based on circumstantial evidence. *State v. Nicely*, 39 Ohio St.3d 147, 151 (1998). "[P]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others." *Id.*; *see also United States v. Andrino*, 501 F.2d, 1373, 1378 (9th Cir. 1974) ("Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable.").

{¶ 38} "When the State relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *Jenks*, 61 Ohio St.3d 259, paragraph one of syllabus, *overruling State v. Kulig*, 37 Ohio St.2d 897 (1974). "Circumstantial evidence is as inherently probative as direct evidence." *State v. Winton*, 2017-Ohio-6908, ¶ 23 (2d Dist.).

{¶ 39} Based on the evidence presented at trial – both direct and circumstantial – we cannot say that the trial court clearly lost its way when it found Boyd guilty of having weapons while under disability and the firearm specification. His conviction was based on sufficient evidence and was supported by the evidence. Therefore, the third assignment of error is overruled.

## V. Evidentiary Issues

{¶ 40} In his fourth assignment of error, Boyd asserts that the court erred when it

"ruled that evidence was inadmissible without considering the evidence itself and instead relying on counsel's opinion of its admissibility." Appellant's Brief at 21. This assignment of error seems to revolve around allegedly threatening text messages that Boyd's girlfriend, Thomas, testified she had received.

**{¶ 41}** "The admission or exclusion of evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." *State v. Malloy*, 2011-Ohio-30, ¶ 64, (2d Dist.). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 2013-Ohio-966, ¶ 34. A court's decision is unreasonable only "if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court . . . would not have found that reasoning process persuasive." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment, Corp.*, 50 Ohio St.3d 157, 161 (1990).

**{¶ 42}** During her cross-examination, Thomas told the jury that she did not inform authorities that E.M. had been shot because she "was getting threatening text messages." Trial Tr. at 584, 589. She conceded that she could have, but did not, share those text messages with law enforcement, though she purportedly handed them over to defense counsel. During an ensuing sidebar (in which the court expressed concern over the fact that the State had not received the alleged text messages during reciprocal discovery), defense counsel related that while he did get messages from Thomas, none were what he considered to be threatening. Following the sidebar, the line of questioning from the State changed to a different topic, and the alleged threatening text messages were not

mentioned again during Thomas's testimony.

{¶ 43} At no time did either side move to admit the alleged threatening messages – that defense counsel *denied even existed* – and the trial made no ruling on text messages from Thomas. There cannot be an error with the admission of evidence when there is no evidence to admit.

{¶ 44} Further, Boyd argues that trial counsel was ineffective for failing to proffer the alleged evidence for review and for failing to use "other evidentiary rules to permit the use of the text messages." Appellant's Brief at 25. This argument must fail, too, because there is no evidence that threatening text messages even existed. Further, even assuming for argument's sake that they did exist, counsel's decision not to use them could have been trial strategy. "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." *State v. Bird*, 81 Ohio St.3d 582, 585 (1998). Boyd's fourth assignment of error is overruled.

### VI. Consideration of Acquitted Charges

{¶ 45} Boyd's next argument is that the trial court violated Evid.R. 404(B) when it considered the acquitted charges in deciding the bench trial's verdict. In other words, he believes the trial court should have been barred from considering the facts presented at the jury trial to reach its different conclusion in the bench trial. We disagree.

{¶ 46} "[W]here a case is separated and the same judge presided over both the jury and bench trial, the judge ha[s] the discretion to consider the evidence from the jury trial in the bench trial." *State v. Johnson*, 2017-Ohio-7264, ¶ 21 (2d Dist.), quoting

*Whitfield v. Intnatl. Truck & Engine Corp.*, 755 F.3d 438, 447, fn. 4 (7th Cir. 2014). *Accord State v. Webb*, 2010-Ohio-6122 (10th Dist.) (finding that a conviction for having weapons under disability was supported by sufficient evidence where the defendant chose to have a bench trial on the weapons under disability charge and a jury trial on his other related charges, and the only testimony presented during the bench trial concerned the defendant's prior felony conviction with other relevant evidence being drawn from the jury trial).

{¶ 47} Here, the trial court presided over the jury trial, at which it heard testimony from E.M. that it was Boyd who shot him in the back of the head. That evidence, along with the uncontested prior felony conviction, was available for the court to make its decision in the having weapons while under disability bench trial.

{¶ 48} Boyd also suggests the trial court acted with bias and "prejudgment," and he cites an off-handed comment the trial court made at the jury trial during a sidebar. When defense counsel informed the court that Boyd's grandmother would be his first witness, the court quipped "Okay. My grandma – she'd grab Dylan and drag him off the stand and slap him around." Trial Tr. at 542. While the comment appears to have been a lighthearted joke, it was probably unnecessary. It did not, however, indicate that Boyd was "pre-judged" by the court.

{¶ 49} Boyd's fifth assignment of error is overruled.

**VII.    Sentence**

{¶ 50} In his sixth and final assignment of error, Boyd argues that his maximum sentence was unsupported by the record.

{¶ 51} A trial court has full discretion to impose any sentence within the authorized statutory range, and it is not required to make any findings or give its reasons for imposing a maximum or more than minimum sentence. *State v. Jones*, 2021-Ohio-325, ¶ 85 (2d Dist.). "However, a trial court must consider the statutory criteria that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12." *Id.*

{¶ 52} When reviewing felony sentences, we must apply the standard of review set forth in R.C. 2953.08(G). Under that statute, an appellate court may increase, reduce, or modify a sentence, or vacate it altogether and remand for resentencing, if it "clearly and convincingly finds either (1) the record does not support certain specified findings or (2) that the sentence imposed is contrary to law." *State v. Worthen*, 2021-Ohio-2788, ¶ 13 (2d Dist.).

{¶ 53} According to the Ohio Supreme Court, we may not independently "weigh the evidence in the record and substitute [our] judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Jones*, 2020-Ohio-6729, ¶ 42. The inquiry is simply whether the sentence is contrary to law. A sentence is contrary to law when it falls outside the statutory range for the offense or if the sentencing court does not consider R.C. 2929.11 and 2929.12. *State v. Dorsey*, 2021-Ohio-76, ¶ 18 (2d Dist.).

{¶ 54} In the case at bar, there is no dispute that Boyd's 36-month sentence was within the statutory range of third-degree felonies, but he argues that it, combined with the imposition of 713 days of post-release control time, did not achieve the principles and purposes of sentencing under R.C. 2929.11, and that the court improperly weighed the

seriousness and recidivism factors from R.C. 2929.12.

**{¶ 55}** At the March 21, 2024 sentencing hearing, the court stated that it had reviewed the presentence investigation (which included information about his previous adult felony convictions for aggravated robbery, felonious assault, and kidnapping) and that it had considered the principles and purposes of sentencing pursuant to R.C. 2929.11 and the seriousness and recidivism factors of R.C. 2929.12. It also noted that the firearm specification must be served consecutively to and prior to the sentence for having weapons while under disability, and that the post-release control time must be served consecutively to the underlying count.

**{¶ 56}** Based on the record before us, Boyd's sentence was not contrary to law; it was within the parameters for third-degree felonies, the firearm specification was required to be served prior to and consecutively to the underlying felony sentence, and remaining post-release control time was mandated to be served consecutively as well. Further, the trial court considered the principles and purposes of felony sentencing and the seriousness and recidivism factors. To the extent that Boyd argues his sentence was unsupported by the record, that argument is foreclosed by *Jones*. Even if it were not, we would find that there was ample evidence in the record to support the sentence. The assignment of error is overruled.

## VIII. Conclusion

**{¶ 57}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.