OPINION
{¶ 1} Defendant-appellant, Lindsey J. Bruce, appeals from the judgment of the Franklin County Court of Common Pleas, entered upon a jury verdict convicting him of one count of aggravated murder, one count of murder, and one count of tampering with evidence, in connection with the death of five-year old Emily Rimel. For the following reasons, we affirm that judgment. *Page 2 
 {¶ 2} On December 6, 2004, Emily lived in a one-bedroom apartment with her mother, Jane Rimel, Jane's fiancé, Brent Copley, [1] and Jane and Brent's son, Travis. Emily and Travis shared the bedroom; Jane and Brent slept on a bed located in the living room/dining room area.
 {¶ 3} Brent had known appellant for ten years; Jane met appellant through Brent; both considered him a good friend. Appellant often visited the apartment and knew the children well. According to both Jane and Brent, Emily was never fearful of appellant. Brent testified that appellant never acted inappropriately with Emily; Jane averred that Emily trusted appellant.
 {¶ 4} Appellant sometimes spent the night at the apartment when he had been drinking heavily and was too intoxicated to drive home. Both Jane and Brent testified that when appellant left the apartment he would always wake one of them so that they could lock the front door behind him; both insisted that appellant never left the front door unlocked.
 {¶ 5} In December 2004, Brent worked during the daytime and Jane worked from midnight to 8:00 a.m. On December 6, 2004, Brent drove Jane to work at 11:45 p.m. Brent's mother, Freda Copley, who lived in the same apartment complex, stayed with the children while Brent was gone.
 {¶ 6} Brent returned shortly after midnight and put the children to bed. Appellant stopped by the apartment around 1:00 a.m. He stayed approximately ten minutes and then left. Thereafter, Brent watched television in the living room. Appellant returned *Page 3 
sometime after 2:00 a.m. and "crash[ed]" on the couch. (Tr. XIII, 2403.) Brent locked the front door and went to sleep.
 {¶ 7} Brent awoke at around 8:00 a.m. Appellant was gone and the front door was unlocked. Brent found this unusual because appellant normally woke him when he left the apartment. Brent went into the bedroom to awaken the children and get them dressed for the day. Emily was not in the bedroom or anywhere else in the apartment. Emily's only pair of shoes and only winter coat were still in the bedroom closet. Brent went to Freda's apartment, told her that Emily was missing, and asked her to watch Travis while he retrieved Jane from work. Both Jane and Brent testified that Emily had never run away and would not wander away from the apartment alone.
 {¶ 8} Brent drove to Jane's workplace and informed her that Emily was missing. The two returned home and again searched the apartment. When they could not find Emily, Jane ran to the manager's apartment and asked her to call 911. Jane reported Emily's disappearance to the 911 dispatcher. Jane described her state of mind at the time as "frantic [and] panicked" (Tr. XII, 2226); according to Brent, Jane was "hysterical." (Tr. XIII, 2423.)
 {¶ 9} In response to the 911 call, Detective Warren Tyler of the Madison Township Police Department dispatched several officers to search the Rimel/Copley apartment and canvass the neighborhood in search of Emily. Later that morning, Detective Tyler interviewed both Jane and Brent at the police station. Brent averred that appellant had spent the previous night at the apartment. Jane testified that she told Tyler that appellant was a trusted friend and that she did not believe that appellant would have taken Emily. *Page 4 
 {¶ 10} Thereafter, Detective Tyler issued an Amber Alert for Emily. At Detective Tyler's request, agents and officers from several other law enforcement agencies, including the Columbus Police Department, Franklin County Sheriff's Office ("FCSO"), Ohio Bureau of Criminal Identification and Investigation ("BCI I") and Federal Bureau of Investigation joined in the investigation. The investigation included, among other things, searches of nearby Heisel Park and Big Walnut Creek and the auto repair garage where appellant, a self-employed mechanic, worked.
 {¶ 11} Detective Tyler sent officers to the Fairwood Avenue address of appellant's mother, where appellant also resided. Appellant was not home, but his mother consented to a search of the residence. Officers later picked appellant up at his home and took him to the police station. Detective Tyler interviewed appellant at approximately 2:00 p.m. on December 7, 2004. Detective Tyler testified that appellant told him he went to the Rimel/Copley apartment around midnight and then again around 2:30 a.m.; between visits, he was at Cornfed Red's, a nearby pool hall/bar. After he left the apartment the second time, he went home, changed his clothes, worked on cars at his garage, and then slept in his car. Around 9:00 the next morning, he went to AutoZone to pick up a car part. The prosecution played the recorded interview for the jury. (State's Ex. F2.) Due to the poor quality of the recording, the prosecution had it transcribed and provided a copy to the jury. (State's Ex. F3.)
 {¶ 12} Appellant's statement to Detective Tyler generally corroborated Detective Tyler's testimony, with some additional details. For instance, appellant stated that when he returned to the apartment, Emily was asleep in the bedroom, but Travis was wide awake and playing in the living room. Brent was half asleep and barely acknowledged *Page 5 
appellant's departure. Appellant went home, changed his clothes, and worked at the garage for about an hour and a half. He went to sleep in his car at around 6:30 a.m. He slept for about two hours and then went to AutoZone to return a rented tool.
 {¶ 13} BCI I Special Agent William Hatfield arrived at the Rimel/Copley apartment around 8:00 p.m. on December 7, 2004. After Detective Tyler briefed him on the investigation, he met with Jane and Brent at the police station. He inspected Brent's upper body and found no marks, wounds, or other evidence of a struggle. He also obtained a DNA standard from Jane and collected DNA from Brent through oral, hand, and penile swabs.
 {¶ 14} Thereafter, Agent Hatfield returned to the Rimel/Copley apartment. He collected numerous pieces of evidence and took several photographs. He noted that the only means of ingress and egress to the apartment was through the front door, and that the apartment had only three windows — two in the living room and one in the bedroom; all three were locked. He testified that neither the door nor the windows exhibited signs of forced entry.
 {¶ 15} Agent Hatfield completed the search of the apartment around 2:30 a.m. on December 8, 2004. He then went to the police station and, pursuant to a search warrant, examined appellant's body, which revealed several small scratches on his right forearm and several small cuts on his right hand. Agent Hatfield testified that the scratches and cuts appeared to be relatively fresh, i.e., inflicted within the past day or so. According to Agent Hatfield, appellant stated that he sustained the injuries while repairing cars. Thereafter, Agent Hatfield collected DNA from appellant via oral, hand, and penile swabs. *Page 6 
 {¶ 16} A few hours later, Agent Hatfield, with appellant's consent, searched the auto repair garage and appellant's vehicle for trace evidence. He testified that although appellant's vehicle was cluttered and dirty, the seats were very shiny. He noticed a bottle of Armor All polish on the floor of the back seat and surmised that the seats had been cleaned with the Armor All. He further averred that the application of Armor All to the vehicle's interior would seriously impair the retrieval of DNA or other trace evidence that might have been on the seats. He also found an AutoZone receipt inside the vehicle; the receipt was dated December 7, 2004 at 9:27 a.m.
 {¶ 17} Agent Hatfield submitted the DNA swabs to BCI I for analysis. BCI I DNA analyst Diane Gehres analyzed the swabs and concluded that the sample obtained from appellant's penis contained a mixture of DNA from appellant and one other source. Although Emily could not conclusively be established as the other contributor, she could not be excluded and the DNA was consistent with her DNA. According to Ms. Gehres, if she sampled 26,930 people there would be only one person among them that could not be excluded. Detective Tyler received the results of the DNA testing on December 17, 2004; he arrested appellant the same day. Detective Tyler acknowledged that at the time of appellant's arrest, none of the searches conducted pursuant to the investigation, other than the penile DNA swab, uncovered any physical evidence implicating appellant in Emily's disappearance.
 {¶ 18} On December 20, 2004, appellant called Detective Tyler from the Franklin County Jail and requested that Tyler contact his attorney for him and ask her to come to the jail because he wanted to talk to her. When Tyler asked appellant why he wanted to speak to his attorney, appellant responded, "cause I know something." (Tr. XVI, 3162.) *Page 7 
The conversation was recorded, and the prosecution played it for the jury. (State's Ex. F.) In addition, the prosecution provided a transcript of the recording to the jury. (State's Ex. F1.) The next day, December 21, 2004, Detective Tyler dispatched a dive team to search the frozen Big Walnut Creek; however, no evidence related to Emily's disappearance was recovered.
 {¶ 19} On December 27, 2004, the Franklin County Grand Jury indicted appellant on one count of kidnapping and one count of rape. Following an eight-day trial, the jury found appellant guilty of kidnapping and not guilty of rape. The trial court sentenced appellant to a prison term of ten years and adjudicated him a sexual predator. This court affirmed appellant's conviction. State v. Bruce, Franklin App. No. 05AP-1313,2006-Ohio-5690.
 {¶ 20} On May 23, 2006, approximately eight months after appellant was convicted of kidnapping Emily, Tara Truax and her son drove to Big Walnut Creek to go fishing. Truax discovered a partial human skull in a wooded area near the creek, eight to ten miles from the Rimel/Copley apartment. Ms. Truax immediately notified the authorities.
 {¶ 21} Numerous law enforcement personnel responded to the scene. Nancy Tatarek, Ph.D., an assistant professor of anthropology at Ohio University and an expert in biological anthropology, examined the area at the request of the Franklin County Coroner's Office ("FCCO"). Dr. Tatarek recovered the skull and transported it to the coroner's office. Based upon an examination of the skull and the teeth that remained in it, Dr. Tatarek concluded that the skull was that of a five to seven-year old child. *Page 8 
 {¶ 22} Daniel Jolly, D.D.S., a professor of dentistry at The Ohio State University and a forensic odontology investigator for the FCCO, examined the partial skull and the teeth on May 24, 2006. Dr. Jolly corroborated Dr. Tatarek's conclusion that the skull and teeth were those of a five to seven-year old child.
 {¶ 23} Following Dr. Jolly's examination, Agent Hatfield submitted the skull and teeth to BCI I for analysis. Max Larijani, a BCI I DNA analyst, extracted DNA from three of the teeth and compared it to the composite DNA profile of Emily developed by Ms. Gehres in December 2004. Mr. Larijani concluded that the DNA profile from the teeth was consistent with Emily's DNA profile. Mr. Larijani also compared the DNA profile from the teeth to the DNA profile taken from the penile swab of appellant and concluded the portion of the population which could not be excluded as contributors to the mixed DNA profile identified on the penile swab from appellant is one in 61,390.
 {¶ 24} On June 12, 2006, the Franklin County Grand Jury indicted appellant on two counts of aggravated murder with death penalty specifications, one count of murder, and one count of tampering with evidence. Count 1 charged appellant with aggravated murder in violation of R.C. 2903.01(C) by purposely causing the death of another who was under 13 years of age at the time of the commission of the offense. Count 2 charged appellant with aggravated murder in violation of R.C. 2903.01(B) by purposely causing the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping. Count 3 charged appellant with murder in violation of R.C. 2903.02(B) by causing the death of another as a proximate result of committing or attempting to commit an offense of violence that is a felony of the first or second degree, kidnapping and/or felonious assault. Count 4 *Page 9 
charged appellant with tampering with evidence in violation of R.C. 2921.12 by, knowing that an official proceeding or investigation was in progress or was about to be or likely to be instituted, altered, destroyed, concealed or removed evidence with purpose to impair its value or availability in such proceeding or investigation.
 {¶ 25} Count 1 carried one death penalty specification: under R.C. 2929.04(A)(9), that appellant purposefully caused the death of another who was under 13 years of age at the time of the offense, and appellant was either the principal offender or acted with prior calculation and design. Count 2 carried three death penalty specifications: (1) under R.C. 2929.04(A)(9), appellant purposefully caused the death of another who was under 13 years of age at the time of the offense, and appellant was either the principal offender or acted with prior calculation and design; (2) under R.C. 2929.04(A)(7), the aggravated murder was committed during or immediately following a kidnapping, and appellant was either the principal offender or acted with prior calculation and design; and (3) under R.C. 2929.04(A)(3), the aggravated murder occurred for the purpose of escaping detection, apprehension, or punishment for the crime of kidnapping.
 {¶ 26} At trial, Thomas Johnson testified that he was incarcerated with appellant in the Warren Correctional Institution in May 2006. According to Mr. Johnson, appellant confessed that he had raped Emily and then killed her by severing her head because he did not want to get "in trouble" for the rape. (Tr. XIII, 2534.) Following the discovery of Emily's skull in Big Walnut Creek, appellant became "paranoid" and accused Mr. Johnson of telling other inmates about his case. Id.
 {¶ 27} Thomas Coverdale testified that he was housed in the Franklin County Jail in December 2004. When appellant arrived at the jail in mid-December 2004, one of the *Page 10 
other prisoners, John Tomlinson, asked appellant if he was the one who raped and killed Emily, and defendant replied, "yep, that would be me." (Tr. XIV, 2814.) Mr. Coverdale also testified that after watching a local television news story about the search for Emily's body in the frozen Big Walnut Creek, he confronted appellant and asked him if Emily was "under the ice." Id. at 2819. Appellant responded that his attorney advised him not to talk about the case. When Mr. Coverdale threatened appellant, appellant stated that, "I did it because I was drunk." Id. at 2820. According to Mr. Coverdale, appellant further stated that Emily was "bleeding real bad" and that he did not know if she was alive or dead so he left her at a park. Id.
 {¶ 28} Kendrick Akins testified that he was incarcerated with appellant at the Warren Correctional Institution. Mr. Akins averred that appellant was "arrogant" after the discovery of Emily's skull, stating that "the head don't match the body and if I did it, so what." (Tr. XV, 2968.)
 {¶ 29} Patrick McCloud testified that he was jailed with appellant in December 2004 in the Franklin County Jail. Mr. McCloud overheard appellant tell Mr. Tomlinson he was going to confess to the authorities; however, appellant divulged no details about the crime.
 {¶ 30} Following the trial court's denial of his Crim. R. 29 motion for judgment of acquittal, appellant presented his case. Brian Wyer testified that on February 23, 2007, he was incarcerated with Thomas Johnson at the Southern Ohio Correctional Facility. Mr. Wyer was watching a television news broadcast that reported that several inmates, including Mr. Johnson, were set to testify at appellant's upcoming trial. Mr. Johnson told *Page 11 
Mr. Wyer that appellant had never told him anything about his case; he was going to testify against appellant, however, because appellant owed him $20.
 {¶ 31} Loretta Leasure testified that she worked with Freda Copley at a child care center and had observed Emily a few times when Brent picked Freda up from work. Loretta and Freda often discussed the fact that Emily was not well cared for and was both academically and socially delayed. When Emily was three-years old, Loretta anonymously reported her concerns to Franklin County Children's Services. Around the same time, Freda approached Loretta and suggested that she consider adopting Emily. Discussions about the potential adoption continued until December 4, 2006, when Emily went missing.
 {¶ 32} Lila Wright, Jane Rimel's cousin and appellant's girlfriend, testified that she lived part-time with the Rimel/Copley family from March through May 2004. During this time, Lila and Emily shared the bedroom. Appellant sometimes spent the night in the bedroom with Lila; according to Lila, he was friendly, but not inappropriate, with Emily. Lila testified that Jane and Brent rarely bathed the children or washed their clothing. She further testified that Brent frequently "paddled" Emily with his hand and "smacked" her in the mouth when she disobeyed him. (Tr. XX, 3881.) On one such occasion, Brent bloodied Emily's mouth.
 {¶ 33} According to Lila, Brent and Jane rarely locked the door to the apartment. On two or three occasions, around 8:00 a.m., she witnessed Emily walk out the front door past her mother and Brent while they slept in the living room; Lila would retrieve Emily and admonish her that she should not go outside without an adult. Lila further testified *Page 12 
that Emily was afraid of the dark and that she had never observed Emily leave the apartment alone when it was dark outside.
 {¶ 34} Following their deliberations, the jury found appellant not guilty of Count 1, guilty of Count 2, with the attendant death penalty specifications, guilty of Count 3, and guilty of Count 4. Following the mitigation phase of the trial, the jury recommended that appellant serve life imprisonment without the possibility of parole as to Count 2, and the trial court sentenced appellant accordingly. The trial court also sentenced appellant to 15 years to life on Count 3 and five years on Count 4. The trial court ordered the sentences imposed on Counts 2 and 4 to be served consecutively to each other and with the sentence imposed in appellant's prior conviction. The court merged the sentence imposed on Count 3 with the sentence imposed on Count 2.
 {¶ 35} Appellant timely appeals and presents two assignments of error for our review, as follows:
 [I.] The prosecuting attorney's comment on Appellant's failure to testify constituted prosecutorial misconduct and denied Appellant his right to a fair trial and due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.
 [II.] The trial court abused its discretion and erred in overruling Appellant's motion for mistrial and permitting the State to introduce into evidence a 911 recording that had not been provided to the defense, thereby violating Rule Sixteen of the Ohio Rules of Criminal Procedure, Appellant's right to a fair trial and due process of law as guaranteed by the Fourteenth Amendments to the United States Constitution, and comparable provisions of the Ohio Constitution.
 {¶ 36} In his first assignment of error, appellant asserts the prosecutor engaged in misconduct during the initial portion of the state's closing argument. Specifically, *Page 13 
appellant contends the prosecutor improperly commented on appellant's failure to testify at trial. Appellant maintains that the prosecutor's misconduct deprived him of a fair trial and due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution. We disagree.
 {¶ 37} "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982), 455 U.S. 209,219, 102 S.Ct. 94. Accordingly, prosecutorial misconduct is not grounds for reversal unless the defendant has been denied a fair trial.State v. Maurer (1984), 15 Ohio St.3d 239, 266. "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." State v.Smith (1997), 80 Ohio St.3d 89, 111, citing State v. Lott (1990),51 Ohio St.3d 160, 165. The test regarding prosecutorial misconduct in closing argument is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights.State v. Smith (1984), 14 Ohio St.3d 13, 14; State v. Jackson (2001),92 Ohio St.3d 436, 441. In making this determination, this court must view the allegedly improper remarks in context and consider the entire closing argument to determine whether the remarks prejudiced the accused. State v. Treesh (2001), 90 Ohio St.3d 460.
 {¶ 38} A prosecutor may not comment on an accused's failure to testify at trial. State v. Fears (1999), 86 Ohio St.3d 329, 336, citingGriffin v. California (1965), 380 U.S. 609. The test for prosecutorial misconduct in commenting upon a defendant's failure to testify is "`whether the language used was manifestly intended or was of such character *Page 14 
that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. "State v. Webb (1994),70 Ohio St.3d 325, 328, quoting Knowles v. U.S. (C.A.10, 1955), 224 F.2d 168,170, quoting State v. Cooper (1977), 52 Ohio St.2d 163, 173.
 {¶ 39} Moreover, even if a prosecutor improperly comments on a defendant's failure to testify, the "conviction must be affirmed if it is concluded, based on the whole record, that the prosecutor's improper comments were harmless beyond any reasonable doubt." State v.Zimmerman (1985), 18 Ohio St.3d 43, 45, citing U.S. v. Hasting (1983),461 U.S. 499, 103 S.Ct. 1974. To determine whether the comments were harmless, this court must determine whether "[a]bsent the prosecutor's allusion to the failure of the accused to testify, is it clear, beyond any reasonable doubt, that the jury would have returned a verdict of guilty?" Id. "To answer this question affirmatively, the remaining evidence standing alone must constitute `overwhelming proof of the defendant's guilt.'" State v. Belcher (Sept. 21, 2000), Franklin App. No. 99AP-620, quoting Harrington v. California (1969), 395 U.S. 250,254.
 {¶ 40} In his closing argument, the prosecutor discussed the defense's theory that Emily's disappearance and subsequent death may have resulted from Jane's and Brent's substandard parenting and decision-making skills rather than from appellant's intentional abduction and murder. In discussing appellant's involvement, the prosecutor noted appellant's alibi that after he left the Rimel/Copley apartment the second time, he spent the next six hours in the auto repair garage. The prosecutor reiterated that the defense wanted the jury to focus on Jane's and Brent's parental failings rather than on the fact that *Page 15 
DNA consistent with Emily's was discovered on appellant's penis and that appellant had confessed to the crime while he was incarcerated. Thereafter, the prosecutor stated:
 So let's look at their story for a moment. Now, they're not required to present anything. They can just sit back and they have that constitutional right to do so, a cherished constitutional right that people have died to bring them. So it's important. However, they did choose to bring something. So let's look at what they brought.
 By the Defendant's own statement to the detective there's six hours completely unaccounted for that nobody can explain except for him.
(Tr. XXI, 3954.) (Emphasis added.)
 {¶ 41} Defense counsel objected, arguing that the prosecutor was "infringing on the Defendant's constitutional rights by saying that we didn't have to bring [anything], but let's see what he did bring, and then present these statements as if we presented those like my client had some burden and he presented this into evidence." (Tr. XXI, 3954-3955.)
 {¶ 42} The trial court expressed concern that the prosecutor's last statement was an "indirect comment on the Defendant's right to remain silent * * * and seem[ed] to indicate a requirement that the Defendant explain[ ] something." Id. The court ultimately admonished the prosecutor and sustained the objection. Thereafter, the prosecutor resumed his argument, focusing the jury's attention on how appellant's alibi allowed him six hours to cover up the crime, including cleaning his car with Armor All, changing his clothes, and washing his hands. Upon the completion of closing arguments, the prosecutor explained in a sidebar discussion that his comments "were based upon the Defendant's statement to the Madison Township Police Department and not based on any failure of himself to testify." (Tr. XXI, 4031.) *Page 16 
 {¶ 43} Appellant contends the challenged comment, emphasized above, was impermissibly directed toward appellant's failure to testify. In support of his argument, appellant relies on State v. Butler (Mar. 28, 2002), Franklin App. No. 01AP-590 ("Butler I"). There, the prosecutor stated during closing argument:
 Basically, if I had to sum up this case in just a few words, I can tell you that the defendant cannot explain the unexplainable. He cannot account for it. He cannot dismiss it. He can't even address it. * * * The defendant cannot account for having this ring. This defendant cannot account for selling this ring. This defendant cannot account for interfering with these witnesses. This defendant cannot account for his multiple versions of where he was that night. He cannot account for the fact that he repeatedly said that he hated an innocent person who had never meant him any harm.
 {¶ 44} This court found the foregoing comment analogous to the prosecutor's comment in State v. Clark (1991), 74 Ohio App.3d 151. InClark, the prosecutor remarked during closing argument that "George [the victim] can't talk, Clark [the defendant] won't." Id. at 156. TheClark court concluded that the prosecutor's comment on the defendant's failure to testify was improper and constituted reversible error because the other circumstantial evidence was not overwhelming. Similarly, the court in Butler I found the evidence not overwhelming as to the defendant's guilt, and thus found that the comment prejudiced appellant and constituted reversible error.
 {¶ 45} Appellee argues the prosecutor's comment was not an improper remark on appellant's failure to testify, but, rather, a reference to appellant's pretrial statement to Detective Tyler in which he failed to satisfactorily account for the six hours following his leaving the Rimel/Copley apartment. Appellee analogizes the prosecutor's comments here to those in State v. Gapen, 104 Ohio St.3d 358, 2004-Ohio-6548. InGapen, the *Page 17 
prosecutor remarked that the defendant was the "best witness for what he did." Id. at ¶ 97. The Supreme Court of Ohio found that the prosecutor's comment referred to the defendant's confession to the police and not his failure to testify. The court placed the comment in the context of the prosecutor's overall argument and found that it was not "manifestly intended" to be a comment on the defendant's failure to testify. Id. at ¶ 106, citing Webb, supra, at 328. The court further noted that "isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." Id., citing Donnelly v.DeChristoforo (1974), 416 U.S. 637, 647, 94 S.Ct. 1868.
 {¶ 46} Appellee also relies upon Webb, supra, and State v.Butler, Franklin App. No. 03AP-800, 2005-Ohio-579 ("Butler II"). InWebb, the prosecutor repeatedly stated during closing argument that the defendant had not explained what happened to money the defendant had taken from a guardianship account. The defendant construed the remarks as comments upon his failure to testify. The Supreme Court of Ohio disagreed, holding that "the context shows that these comments dealt not with Webb's failure to testify, but with Webb's failure to explain to the probate court and to his own family what he did with the money." Id. at 329.
 {¶ 47} Similarly, in Butler II, the defendant claimed that the prosecutor's following statements constituted improper commentary on his failure to testify:
 * * * But you know what? As bad as they can make Matt look, the Defendant, in all of his many statements, has never volunteered anything about having this ring. You know that's what the cops are gonna want to talk to him about. They don't want to hear about Matt's birthday or Christmas presents and D.C. and everything. All he has to say is, "I got the ring," and all of a sudden, this investigation will take a completely different tone."
Id. at ¶ 9. *Page 18 
 {¶ 48} This court rejected the defendant's challenge, emphasizing that the defendant's pretrial statements were in evidence and that the prosecutor had considerable latitude in commenting on the evidence introduced at trial. Id. at ¶ 11, 17. This court concluded that, "[although the prosecutor's statement was in the present tense, when viewed in context, we do not view it as an attempt of the prosecutor to focus the jury's attention on defendant's decision not to testify or to be of such character that the jury would naturally and necessarily take it to be a comment on the failure of defendant to testify." Id. at ¶ 18.
 {¶ 49} Viewing the prosecutor's comment in light of the evidence presented at trial, we find that the prosecutor did not contravene the bounds of proper conduct. The prosecutor's comment and his purpose behind it were comparable to the circumstances in Gapen, Webb, andButler II. Unlike Butler I, where the prosecutor made generalized comments about the defendant's inability to account for various events, the prosecutor here expressly referred to "[defendant's own statement to the detective." Indeed, appellant's statement to Detective Tyler exposed an uncorroborated six-hour gap between his 3:00 a.m. departure from the Rimel/Copley apartment and his 9:00 a.m. arrival at AutoZone. Detective Tyler testified that his investigation was unable to establish appellant's whereabouts, other than appellant's uncorroborated statement, during that time. The prosecutor's comment was thus properly directed at the evidence that had been admitted at trial and the inferences that could reasonably be drawn therefrom, i.e., that the six-hour window in appellant's pretrial account would have allowed him ample time to destroy or hide evidence. Further, following the sidebar conference, the prosecutor resumed this argument without objection by appellant. Thus, we agree with *Page 19 
appellee that the prosecutor's comment during closing argument was not directed toward appellant's constitutional right not to testify, and instead referred to appellant's pretrial statement to Detective Tyler. As in Butler II, although the prosecutor's statement was in the present tense, when viewed in the context in which it was made, we cannot find that the statement was "manifestly intended" or "of such character that the jury would naturally and necessarily take [the statement] to be a comment on the failure of the accused to testify." Webb, at 328.
 {¶ 50} Moreover, the trial court instructed the jury on the presumption of innocence, appellee's burden of proof, and that counsel's closing arguments were not evidence. In addition, following the parties' closing arguments, the trial court instructed the jury that appellant had a constitutional right not to testify and that his decision not to testify could not be considered for any purpose. This instruction echoed an earlier instruction given by the trial court, albeit in a different context, that had been stipulated to by the parties: "[y]ou are also instructed that it is the right of anyone accused of a crime to remain silent and that no negative inference may be made if a person asserts a constitutional right including the right to remain silent." (Tr. XV, 2842.) The jury is presumed to follow the court's instructions.State v. Coleman (1999), 85 Ohio St.3d 129, 135. Based upon the foregoing, we conclude that the prosecutor did not commit prosecutorial misconduct in closing argument.
 {¶ 51} Furthermore, even if the prosecutor's statement could be construed as an improper comment on appellant's failure to testify, the statement was harmless beyond a reasonable doubt, as the evidence in this case, standing alone, constituted "overwhelming" proof of appellant's guilt. Belcher, supra. First, the evidence supports an *Page 20 
inference that Emily did not leave the apartment on her own. The incident occurred in early December, yet Emily's shoes and winter coat were still in the closet. Both Jane and Brent testified that Emily had never wandered away from home on her own, and Lila, appellant's own witness, averred that Emily was afraid of the dark. In addition, both Jane and Brent averred that Emily was not fearful of appellant and Jane testified that Emily trusted him. The jury could reasonably infer from this testimony that appellant could have easily persuaded Emily to leave the apartment with him.
 {¶ 52} Second, the evidence demonstrates that appellant had the opportunity to commit the offense. Brent testified that appellant was at the apartment prior to Emily's disappearance, and, unlike other times when appellant spent the night, he left without waking Brent to lock the door when he left. In addition, Detective Tyler testified that appellant admitted that he was at the apartment on the morning Emily disappeared. Moreover, appellant's statement to the detective revealed a six-hour unaccounted for and uncorroborated time span following Emily's disappearance. This six-hour window provided appellant ample opportunity to conceal or destroy evidence.
 {¶ 53} Third, several inmates testified that appellant cavalierly confessed to the crimes. Finally, and perhaps most importantly, the prosecution's DNA experts testified that DNA consistent with Emily's was found in the penile swab taken from appellant, that Emily could not be excluded as the contributor of that DNA, and that only one person in 61,390 would have DNA consistent with Emily's DNA. For the foregoing reasons, we overrule appellant's first assignment of error. *Page 21 
 {¶ 54} In his second assignment of error, appellant asserts the trial court erred in overruling his motion for mistrial and permitting the prosecution to introduce into evidence the audiotape recording of Jane's 911 call. We disagree.
 {¶ 55} During her cross-examination, Jane testified that when appellant spent the night at the apartment, he always woke her or Brent before he left so that they could lock the door and that he never left the door unlocked. When defense counsel asked if she recalled telling the 911 operator that appellant tended to leave the door unlocked, she responded that she would never have made such a statement because it would have been untruthful. (Tr. XI, 2183.)
 {¶ 56} Defense counsel attempted to impeach this testimony with a "detail call sheet" of the 911 call; the prosecutor objected and at a sidebar colloquy, defense counsel admitted that the summary was not a verbatim transcript of the 911 call. The trial court asked the prosecutor if there was a transcript of the 911 call; the prosecutor responded, "[n]ot that we have." (Tr. XII, 2212.) Following a lengthy discussion, the trial court sustained the prosecutor's objection to defense counsel's use of the detail call sheet. Defense counsel later proffered it into evidence. In pertinent part, the detail call sheet provides that, "family friend Lindsay was there last night but not there now. He left last night and poss[ibly] left door unlocked[.] * * * Mom does not believe Lindsay took the child but when he lives [sic] the house on a regular basis he does not have a key so he does tend to leave the doors unlocked[.]" (Defendant's Proffered Ex. 1.)
 {¶ 57} Later, during Detective Tyler's cross-examination, defense counsel asked if he had a recording of the 911 call. Detective Tyler responded in the affirmative and further stated that he had provided the tape to the prosecution at the beginning of the trial. *Page 22 
Defense counsel asserted he would likely move for a mistrial because the prosecution had erroneously indicated that the 911 tape did not exist. The prosecution averred it had requested Detective Tyler to provide all tapes in the police department's possession, including the 911 tape, and that it had never misrepresented to the court that it did not possess the tape. The court noted that "[t]he level of cooperation that has existed throughout this case between counsel has been noted and commented upon by both sides many times." (Tr. XVI, 3213.)
 {¶ 58} Thereafter, upon inquiry by the court, Detective Tyler reported that the tape was part of the police case file and that he had mistakenly stated that he had provided the tape to the prosecution. (Tr. XVI, 3224.) The trial court ordered Detective Tyler to inventory all the tapes in the case file and bring them to court the next day. Detective Tyler complied with this directive. After the court and counsel listened to the 911 tape in chambers, the prosecution stated that it wished to introduce the tape into evidence, recall Jane, and question her about it.
 {¶ 59} The trial court and defense counsel agreed that the detail call sheet was inaccurate. Defense counsel argued that he would have structured his cross-examination of Jane differently had he had access to the 911 tape prior to trial. Defense counsel further maintained that his credibility with the jury was damaged as a result of his earlier inaccurate cross-examination. The trial court suggested that the situation could be cured by an instruction to the jury that the tape had only recently been made available to the parties. The trial court further noted that the prosecution's eagerness to utilize the 911 tape belied any suggestion that it was previously aware of the tape's existence. (Tr. XVII, 3253.) *Page 23 
 {¶ 60} Thereafter, the court entertained arguments on the motion for mistrial. Defense counsel reiterated his argument that the prosecution's failure to provide the 911 tape in discovery negatively affected the manner in which the defense case had been structured, thereby prejudicing appellant.
 {¶ 61} The prosecution contended that because it was previously unaware of the existence of the 911 tape, it could not have improperly withheld it from appellant. The prosecution further argued that any discovery violation was curable because the tape was now available to the defense and that the substance of the 911 call was substantially similar to the testimony already provided by Jane and Brent. The prosecution noted that the trial court could grant a recess if requested by defense counsel.
 {¶ 62} In response, defense counsel maintained that the prosecution's response to appellant's request for discovery, which indicated that the defense should contact the prosecutor regarding the 911 tape, constituted prima facie evidence that the prosecution had the 911 tape. Defense counsel further maintained that the absence of the tape negatively affected his trial preparation, and to cure the problem, he would need to recall several witnesses, including Jane, Brent, and Agent Hatfield. Defense counsel further argued that even if the prosecution was previously unaware of the tape's existence, the prosecution should be held responsible for Detective Tyler's error.
 {¶ 63} Following these arguments, the trial court denied the motion for mistrial. The court found the evidence "basically overwhelming beyond a reasonable doubt" that the prosecution was not aware of the existence of the tape. (Tr. XVII, 3270.) The court further noted that since the 911 tape did not provide a basis for impeaching Jane, the notion of any prejudice arising from the inability to impeach her earlier was now a non-issue. *Page 24 
The court also rejected defense counsel's "nonspecific claims of other changes in strategy." (Tr. XVII, 3271.) The court recognized, however, the potential problem stemming from defense counsel's inaccurate cross-examination of Jane based upon the detail call sheet. To that end, the court offered to cure any potential prejudice to either party by instructing the jury that the tape had only recently been discovered.
 {¶ 64} Later in the trial, the prosecution sought to introduce the 911 tape via the testimony of Lieutenant Karen Cotner, commander of the communication center at the FCSO. Defense counsel renewed his objection, again arguing that appellant was prejudiced due to the late discovery and production of the tape. The trial court, noting the consistency between the tape and Jane's testimony, concluded that appellant would not suffer material prejudice in the admission of the tape. The trial court emphasized that the defense could recall any witnesses relevant to the tape. The trial court also proposed a potential jury instruction addressing the tape, but defense counsel objected to the instruction.
 {¶ 65} Following this discussion, the prosecution played the tape of the 911 call. The tape disclosed that the apartment manager who initiated the call at Jane's request reported that Emily was missing. During the initial portion of the call, the manager relayed information from Jane and Brent. When the dispatcher asked if any of the doors or windows had been left open, Jane's voice can be heard in the background saying, "Lindsey was there and Brent don't know what time he left." (Tr. XVIII, 3601.) Thereafter, Jane took the phone and reported that appellant "always crashes and then he'll wake up and leave and he must have left the door unlocked because I know he didn't take her." (Tr. XVIII, 3602.) When the dispatcher asked if appellant left a door unlocked, Jane *Page 25 
replied, "Yes. He doesn't have a key to lock it." (Tr. XVIII, 3602.) Brent's voice can then be heard in the background saying, "He's supposed to wake me up. He always does." (Tr. XVIII, 3602.) Jane further reported that Emily had never wandered away in the middle of the night. The dispatcher asked if there was a possibility that appellant had taken Emily; Jane said, "No. It's not a possibility. He's a really close friend. He would never do that." (Tr. XVIII, 3605.)
 {¶ 66} On cross-examination, Lieutenant Cotner identified the detail call sheet as having been created by the FCSO dispatcher at the time of the call. Later, when the prosecution moved to admit its exhibits, defense counsel again objected to the 911 tape; the trial court overruled the motion. The defense then presented its case-in-chief without recalling Jane or Brent.
 {¶ 67} On appeal, appellant contends the prosecution's failure to turn over evidence favorable to appellant violates Brady v. Maryland (1963),373 U.S. 83, 83 S.Ct. 1194. "Suppression by the prosecution of evidence that is favorable to the accused and `material either to guilt or to punishment' is a violation of due process." State v. LaMar,95 Ohio St.3d 181, 2002-Ohio-2128, at ¶ 27, quoting Brady, at 87. The duty to disclose exculpatory evidence extends to those government officials within the prosecutorial arm of the government, i.e., the prosecutor and "others acting on the government's behalf in the case, including the police." Kyles v. Whitley (1995), 514 U.S. 419, 437, 115 S.Ct. 1555. "Evidence suppressed by the prosecution is `material' within the meaning of Brady only if there exists a reasonable probability that the result of the trial would have been different had the evidence been disclosed to the defense." LaMar, citing Kyles at 433-434. "The question is not whether the defendant would more likely than not have *Page 26 
received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id., quoting Kyles, at 434. An accused bears the burden of proving a Brady violation and denial of due process.State v. Jackson (1991), 57 Ohio St.3d 29, 33.
 {¶ 68} Despite appellant's claims, the prosecution did not violateBrady by withholding the 911 tape. The tape was disclosed to appellant"during the trial (and not after the trial as in Brady), and noBrady violation exists." State v. Hanna, 95 Ohio St.3d 285,2002-Ohio-2221 at ¶ 82; see, also, State v. Iacona (2001),93 Ohio St.3d 83, 100. As this court noted in State v. Banks (June 27, 2002), Franklin App. No. 01AP-1179, the Iacona court recognized, however, that "federal cases have held disclosure may be so late during the trial as to violate due process: `It has, however, been held that the philosophical underpinnings of Brady support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial. Even where information may be exculpatory, "[n]o due process violation occurs as long asBrady material is disclosed to a defendant in time for its effective use at trial."`" Id., quoting Iacona, quoting U.S. v. Smith Grading Paving, Inc. (C.A.4, 1985), 760 F.2d 527, 532.
 {¶ 69} Here, the prosecution turned over the tape prior to the presentation of appellant's case-in-chief; accordingly, the tape was available to appellant in time for its effective use at trial. The trial court made it clear that defense counsel could recall any witnesses, including Jane and Brent, relevant to the 911 tape, but appellant chose not to do so. As a result, the timing of the disclosure fails to support a due process violation. *Page 27 
 {¶ 70} Appellee concedes, however, that its late disclosure of the tape violated Crim. R. 16. Prosecutorial violations of Crim. R. 16 require reversal only when the defendant demonstrates that: (1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the defense, and (3) the defendant suffered prejudice. State v. Jackson, 107 Ohio St.3d 53,2005-Ohio-5981, at ¶ 131, citing State v. Parson (1983),6 Ohio St.3d 442, 445.
 {¶ 71} "[T]he trial court is vested with a certain amount of discretion in determining the sanction to be imposed for a party's nondisclosure of discoverable material. The court is not bound to exclude such material at trial although it may do so at its option. Alternatively, the court may order the noncomplying party to disclose the material, grant a continuance in the case or make such other order as it deems just under the circumstances." Id. The decision to admit evidence despite its late disclosure will be reversed only upon a showing of an abuse of discretion. Id.
 {¶ 72} We do not find an abuse of discretion in this case. Under the first prong of the Jackson test, the trial court found that the prosecution's failure to disclose the tape was not willful. Indeed, following extended discussions with the prosecution and defense counsel and an inquiry of Detective Tyler, the court concluded that the evidence was overwhelming that the prosecution was previously unaware of the tape's existence. We find no reason to overturn that determination on appeal.
 {¶ 73} As to the second prong, appellant fails to explain with any specificity how earlier disclosure of the tape would have aided his defense. As noted, defense counsel argued at trial that he would have structured the defense differently had he been aware of the tape prior to trial, but the trial court noted that such non-specific claims did not *Page 28 
establish prejudice. Again, we see no basis to invalidate the trial court's ruling on this record.
 {¶ 74} Regarding the third prong, appellant has failed to demonstrate how he was prejudiced. As noted above, the trial court made clear that appellant could recall any witnesses pertinent to the 911 tape. The trial court also recognized that defense counsel's earlier knowledge of the tape would have prevented the inaccurate cross-examination of Jane based upon the detail call sheet. To that end, the trial court indicated that it would craft a jury instruction to cure any possible prejudice for the defense in this regard. However, defense counsel rejected the instruction proposed by the court and did not propose any alternative. Having declined the court's proposed remedial measure, the defense cannot now claim prejudice. Jackson, at ¶ 132.
 {¶ 75} "The decision whether to declare a mistrial is one addressed to the sound discretion of the trial court." Parker v. Elsass, Franklin App. No. 01AP-1306, 2002-Ohio-3340, at ¶ 27, citing Quellos v.Quellos (1994), 96 Ohio App.3d 31. This standard is based upon the notion that the trial court is in the best position to determine whether the circumstances of the case necessitate the declaration of a mistrial or whether other corrective measures are adequate. Id. A reviewing court may not substitute its judgment for that of the trial court absent an abuse of discretion. Id. A mistrial should be granted only where the party seeking it demonstrate that he or she suffered material prejudice so that a fair trial is no longer possible. State v. Franklin (1991),62 Ohio St.3d 118.
 {¶ 76} Upon review of the record, we find no abuse of discretion by the trial court in denying the motion for mistrial. The trial court carefully considered the parties' arguments, the circumstances of the case, and offered remedial measures to eliminate *Page 29 
any potential prejudice to appellant related to the late disclosure of the 911 tape. Accordingly, the trial court did not abuse discretion in refusing appellant's request for a mistrial. The second assignment of error is overruled.
 {¶ 77} Having overruled both of appellant's assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
BRYANT and FRENCH, JJ., concur.
[1] Jane and Brent married in October 2006. *Page 1